**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KIMBERLY ANN GREAVES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-135 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., Chief Judge.

### I.     INTRODUCTION

Kimberly Ann Greaves ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq*.  Plaintiff filed her applications on November 19, 2009, alleging disability since January 1, 2008 due to diarrhea, breathing problems, severe migraines, depression, degenerative eye disease, high blood pressure and high cholesterol (AR 141-144; 185; 189).[1]  Her applications were denied (AR 94-103), and following a hearing held on November 12, 2010 (AR 34-64), the administrative law judge ("ALJ") issued her decision denying benefits on December 9, 2010 (AR 23-30).  Plaintiff's request for review by the Appeals Council was denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  She filed her complaint challenging the ALJ's decision, and presently pending before the Court are the parties' cross-motions for summary judgment.  For the following reasons, Plaintiff's motion will be denied and the Commissioner's motion will be granted.

---

[1] References to the administrative record [ECF No. 6], will be designated by the citation "(AR ___)".

## II. BACKGROUND

Plaintiff was 53 years old on the date of the ALJ's decision (AR 139). She is a high school graduate with past relevant work experience as a cashier and a clerical assistant (AR 196).

Plaintiff was treated by Jack Yakish, M.D., from January 28, 2006 through October 14, 2009, for a variety of health complaints including, *inter alia*, migraine headaches and back pain (AR 246-265). In April 2008, Plaintiff complained of migraine headaches and reported that Imitrex was not effective in controlling her symptoms (AR 255). On August 31, 2009, Plaintiff complained of a migraine headache and Dr. Yakish prescribed Fioricet (AR 246). On October 14, 2009, Plaintiff reported suffering from increased headaches (AR 245). Plaintiff also occasionally complained of back pain, for which Dr. Yakish prescribed Flexeril and/or Vicodin (AR 251).

Plaintiff began treating with Deborah Bishop, M.D. on November 12, 2009 and reported shortness of breath upon exertion, with some intermittent shortness of breath while lying down (AR 287). Plaintiff further reported a past history of *inter alia*, high blood pressure and migraine headaches (AR 287). She indicated that she worked at a grocery store and had generally been feeling well (AR 287). On physical examination, Dr. Bishop noted that Plaintiff was in no acute distress, and her head, eye, ear, nose and throat examinations were within normal limits (AR 287). She found Plaintiff's lungs were clear to auscultation, with diminished breath sounds bilaterally (AR 287). Plaintiff's heart examination was normal and she had no chest wall abnormalities (AR 287). Plaintiff's lower extremities revealed no cyanosis, clubbing or edema, and her pulses were normal (AR 287). Dr. Bishop diagnosed Plaintiff with "chronic airway obstruction not elsewhere classified" and "migraine with aura" (AR 287). She prescribed Atrovent, an aerosol inhalant, for use as needed (AR 287). It was noted that Plaintiff's other regular medications included Crestor, Atenolol, Imitrex and occasionally, Fioricet (AR 287).

A chest x-ray dated November 16, 2009 revealed that Plaintiff's lungs were clear bilaterally, with no acute pulmonary disease (AR 292). Degenerative changes in the Plaintiff's upper thoracic spine were noted (AR 292). A report dated November 19, 2009, showed that Plaintiff's lab results were all within normal limits (AR 290).

Plaintiff returned to Dr. Bishop on November 30, 2009 and reported shortness of breath with exertion (AR 286). On physical examination, Dr. Bishop found Plaintiff's lungs were clear to auscultation (AR 286). Plaintiff's remaining physical examination remained unchanged, and Dr. Bishop noted that Plaintiff's lab results were good (AR 286). She added Spiriva and Proair to Plaintiff's medication regimen (AR 286).

On December 17, 2009, Plaintiff's pulmonary function test showed moderate obstructive ventilatory defect (AR 277).[2] No restrictive ventilatory defect was present (AR 277).[3] Plaintiff's room air oxygen saturation at rest was ninety-nine percent (AR 277).

Plaintiff returned to Dr. Bishop on January 4, 2010 and reported shortness of breath while walking (AR 285). She further reported that her legs felt heavy when she walked or stood for long periods of time at work (AR 285). Dr. Bishop reported that Plaintiff's pulmonary function test showed moderate obstructive lung disease, and that her room air oxygen saturation was ninety-nine percent (AR 285). On physical examination, Dr. Bishop found Plaintiff in no acute distress, and her head, eye, ear, nose and throat examinations were within normal limits (AR 285). Plaintiff's lungs were clear to auscultation, her heart examination was normal, and she had no chest wall abnormalities (AR 285). Plaintiff's lower extremities revealed no cyanosis, clubbing or edema, and her pulses were normal (AR 285). Plaintiff's diagnosis and medications remained the same (AR 285).

On January 10, 2010, Plaintiff had a non-invasive arterial examination of her lower extremities (AR 295-296). It was noted that Plaintiff had bilateral foot and toe coldness causing pain, with her right leg worse than her left (AR 295). She further reported that her legs ached and were fatigued after walking half a block (AR 295). The exam showed probable mild bilateral superficial femoral artery stenosis with no significant reduction in flow with rest, although producing symptoms (AR 295-296). It was suggested that clinical correlation would

---

[2] Obstructive ventilatory defect is the slowing of airflow during forced expiration. *See* http://medical-dictionary.thefreedictionary.com/obstructive+ventilatory+defect.

[3] Restrictive ventilatory defect is a reduction in total lung capacity. *See* http://medical-dictionary.thefreedictionary.com/restrictive+ventilatory+defect.

be helpful since the Plaintiff was experiencing "significant claudicant symptoms" that were debilitating and further evaluation was indicated (AR 296).

Plaintiff's thoracic and lumbar x-rays dated February 5, 2010 showed diffuse osteopenia, scoliotic curvature of the thoracic spine, and possible mild compression deformity of the T4 (AR 293). On February 17, 2010, Plaintiff reported to Dr. Bishop that she had stopped using Advair because it caused sore throat pain (AR 283). Plaintiff continued to work at the grocery store (AR 283). Plaintiff also complained that her feet were cold (AR 283). Plaintiff's physical examination remained unchanged and she was prescribed Symbicort to replace the Advair (AR 283).

Plaintiff returned to Dr. Bishop on March 5, 2010 and her complaints and physical examination remained unchanged (AR 338-339). She reportedly continued to work (AR 338). Dr. Bishop added nebulizer therapy every four to six hours to Plaintiff's medication regimen (AR 337). Dr. Bishop completed a "Medical Statement Regarding Social Security Disability Claim" and reported Plaintiff's diagnoses were COPD, migraines, fibromyalgia, hyperlipidemia, and peripheral vascular disease (AR 310). She stated that Plaintiff's symptoms included shortness of breath, fatigue, wheezing, numbness and pain in her feet, intolerance to cold, and headaches (AR 310). She indicated that Plaintiff was unable to work (AR 310).

On a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" form, Dr. Bishop opined that Plaintiff could occasionally lift/carry ten pounds, stand/walk less than two hours, and sit less than six hours (AR 311). Dr. Bishop indicated that Plaintiff experienced fatigue requiring rest periods during the day, and needed to frequently elevate her legs during an eight-hour workday (AR 312). She opined that Plaintiff was limited in her pushing and pulling abilities due to peripheral vascular disease and emphysema (AR 312). Dr. Bishop indicated that Plaintiff could never perform postural functions, was unable to reach above chest level, and was limited in her ability to speak because she became "breathless" (AR 312). She opined that Plaintiff needed to avoid exposure to poor ventilation, temperature extremes, and inhalation of chemicals due to "severe" COPD (AR 312).

Dr. Bishop also completed a document entitled "Medical Statement Regarding Pain" (AR 313). Dr. Bishop stated that Plaintiff suffered from moderate pain due to fibromyalgia and arthritis, resulting in a loss of interest in almost all activities, sleep disturbance, decreased energy, and difficulty breathing (AR 313). On a "Medical Statement Regarding Headaches" form, Dr. Bishop stated that Plaintiff experienced migraine headaches about once a week, lasting more than twenty-four hours, and was unable to work when she had a headache (AR 314). Dr. Bishop indicated that symptoms associated with the Plaintiff's headaches included nausea, vomiting, photophobia, and increased noise sensitivity (AR 314).

Plaintiff returned to Dr. Bishop on March 12, 2010 and Dr. Bishop's treatment note entries remained essentially unchanged from Plaintiff's last two office visits (AR 331). Plaintiff's physical examination was unremarkable; Dr. Bishop reported that Plaintiff was in no acute distress, her lungs were clear to auscultation, she had a regular heart rate and rhythm, and her chest wall was within normal limits (AR 331). Plaintiff's extremities revealed no clubbing, cyanosis or edema, and her pulses were normal (AR 331).

On April 6, 2010, Plaintiff was evaluated by Thomas Wittmann, M.D., at Chest Diseases of Northwestern PA for shortness of breath complaints (AR 315). Plaintiff reported that she smoked up to three packs of cigarettes daily for decades, but had cut back to one-half a pack daily (AR 315). She acknowledged that she had been advised by a number of physicians to stop smoking but was reluctant to quit for fear of weight gain (AR 315). Plaintiff complained of breathlessness with exertion, accompanied by intermittent wheezing, usually associated with respiratory tract infections (AR 315). On physical examination, Dr. Wittmann reported that Plaintiff appeared "somewhat chronically ill" but was in no acute distress (AR 316). He found Plaintiff had mild expiratory wheezing with no pleural rub[4] or stridor[5] (AR 316). Chest x-rays were taken, and Dr. Wittmann found evidence of chronic airflow obstruction without interval change from Plaintiff's previous x-rays on November 16, 2009 (AR 317-318). Dr. Wittmann noted that Plaintiff's spirometry showed moderate airflow obstruction, and that a six-minute

---

[4] Pleural rub is a friction sound heard during breathing on physical examination. *See* http://medical-dictionary.thefreedictionary.com/pleural+rub.
[5] Stridor is a high-pitched respiratory sound. *See* http://medical-dictionary.thefreedictionary.com/stridor.

walk test demonstrated mild exercise limitation (AR 317; 319). He diagnosed Plaintiff with moderate COPD with a "significant and ongoing cigarette smoking history" (AR 317). Dr. Wittmann noted that he spent more than fifty percent of the office visit discussing with Plaintiff the nature of her illness and the "absolute need" for her to stop smoking (AR 317). He noted Plaintiff was reluctant to stop but would consider doing so (AR 317). She was advised to continue using Symbicort but to discontinue Spiriva when she began using a nebulizer (AR 317).

On May 6, 2010, Dr. Bishop prescribed Plaintiff home oxygen therapy to use during sleep and during the daytime as needed (AR 321-323; 342).

Plaintiff returned to Dr. Bishop on September 13, 2010 and complained of diffuse pain in her joints and muscles (AR 340). Dr. Bishop noted that Plaintiff had a history of fibromyalgia and was taking Mobic (AR 340). Plaintiff further complained of swelling at the base of her right thumb, exacerbated by working with clay crafting materials (AR 340). Plaintiff indicated that she switched back to an inhaler and her breathing was stable (AR 340). She reported some cyanosis in her toes at times (AR 340). Plaintiff reportedly continued to work (AR 340). Plaintiff's lungs were clear, she had a regular heart rate and rhythm, and her chest wall was within normal limits (AR 340). Plaintiff's extremities revealed no clubbing, cyanosis or edema, and she had normal pulses (AR 340). Dr. Bishop diagnosed Plaintiff with COPD, osteoarthrosis, and myalgia (AR 340). She added Gabapentin and Meloxicam to her medication regimen (AR 340).

Plaintiff and William Reed, a vocational expert, testified at the hearing held by the ALJ on November 12, 2010 (AR 34-64). Plaintiff testified that she stopped working in January 2010 because she frequently missed work due to breathing and back problems (AR 39). She testified that she suffered from shortness of breath, cold feet, and fatigue (AR 43). Plaintiff stated that she used inhalers for her breathing problems (AR 44). She also used oxygen at night, but periodically used it during the day as well (AR 44). Plaintiff testified that she suffered from daily back pain exacerbated by walking (AR 46). She used a heating pad to alleviate the pain and took Vicodin once a week (AR 46).

Plaintiff further testified that she suffered from a "bad" headache once a week which caused vomiting, noise and light sensitivity, and required her to lie down (AR 50-52). She also suffered from less severe headaches on a weekly basis (AR 52-53). Plaintiff indicated she took Imitrex for her headaches (AR 51). Plaintiff stated that her legs were weak and ached, and that she elevated them during the day to alleviate ankle swelling (AR 53-54). Plaintiff testified that she lived alone and was able to perform some household chores, but no yard work (AR 40). She stated she could drive but only during the day (AR 40). Plaintiff indicated that she could sit for thirty minutes, stand for no more than twenty minutes, walk one block, and lift ten pounds (AR 40-41). Plaintiff claimed that she needed to lie down two to three times a day for about one-half hour (AR 48).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work with a sit/stand option (AR 58-59). Further, the individual would need to avoid exposure to fumes, odors, dust, gasses, chemical irritants, poor ventilation, temperature extremes, and extreme dampness and humidity (AR 59). The vocational expert testified that such an individual could perform the Plaintiff's past relevant work as a clerical assistant, as well as other jobs such as a cashier, security guard, and photocopying machine operator (AR 59-60).

Following the hearing, the ALJ issued a written decision finding that the Plaintiff was not entitled to a period of disability, DIB or SSI within the meaning of the Act (AR 23-30). Her request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-6). She subsequently filed this action.

### III.   STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995).  It has

been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV.    DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through March 31, 2014 (AR 25). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).  The Commissioner uses a five-step evaluation process to determine when an individual meets this definition.  20 C.F.R. §§ 404.1520; 416.920.  The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

   The ALJ concluded that Plaintiff's migraine headaches, COPD, fibromyalgia and peripheral vascular disease were severe impairments, but determined at step three that she did not meet a listing (AR 25-26).  The ALJ found that she was able to perform work at the light level with a sit/stand option at her discretion, but was precluded from working in environments involving exposure to fumes, odors, dust, gases, chemical irritants, poor ventilation, temperature extremes, and extremes of dampness and humidity (AR 26-27).  At the final step, the ALJ concluded that Plaintiff could perform her past relevant work as a clerk assistant, and other jobs such as a cashier and security guard (AR 29).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

   Plaintiff's challenges relate to the ALJ's residual functional capacity ("RFC") assessment.  "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a).  An individual claimant's RFC is an

administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). Moreover, the ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id*. (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

The ALJ concluded that the Plaintiff could perform light work with a sit/stand option at her discretion, without exposure to environmental irritants (AR 26-27). In making this determination, the Plaintiff argues that the ALJ improperly rejected the opinion of Dr. Bishop, her treating physician. *See* [ECF No. 9] pp. 5-16.[6] Dr. Bishop opined that Plaintiff was unable to work, and rendered an RFC assessment that essentially precluded the Plaintiff from working (AR 310-312). The ALJ declined to accord "much weight" to Dr. Bishop's assessment however, finding that it was unsupported by the diagnostic studies, findings on physical examination, and the Plaintiff's activities (AR 29).

A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Even when a treating physician's opinion is not given controlling weight, it is entitled to "great weight, especially when [it] reflect[s] expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). In rejecting a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a

---

[6] Plaintiff limits her challenges to the ALJ's evaluation of the evidence as it relates to her COPD, migraine headaches, and peripheral vascular disease. *See* [ECF No. 9] p. 16. We confine our discussion accordingly.

treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion.  *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment").  Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so.  *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981).

   The ALJ found that Dr. Bishop's opinions with respect to the Plaintiff's COPD and peripheral vascular disease were inconsistent with the diagnostic studies (AR 29).  The ALJ observed that Plaintiff's pulmonary function studies disclosed only moderate obstructive disease, and that the results of her chest x-rays had not changed appreciably since November 2009 (AR 28).  The ALJ further observed that Dr. Wittmann, Plaintiff's respiratory specialist, concluded that Plaintiff's respiratory condition was moderate (AR 28).  The ALJ noted that with respect to the Plaintiff's peripheral vascular disease, her arterial studies revealed only mild findings (AR 28).  We reject the Plaintiff's contention that the ALJ improperly substituted her own interpretation or opinion of the diagnostic tests in discrediting Dr. Bishop's opinion.  The ALJ's characterization of these tests was taken directly from the reports and/or the Plaintiff's treating physicians' interpretation of them.

  The ALJ further found that Dr. Bishop's opinions were unsupported by her physical examination findings, and were contradicted by the findings of Dr. Wittmann (AR 28-29).  For example, the ALJ observed that Dr. Bishop reported that the Plaintiff suffered from shortness of breath, wheezing, cold feet and diminished pulses (AR 29).  However, she noted that Dr. Bishop's various physical examinations and Dr. Wittmann's report did not reveal any serious pulmonary complications or severe vascular impairment involving the lower extremities that would affect the Plaintiff's ability to stand and walk in a typical day (AR 29).

  The ALJ found that Dr. Bishop's opinion with respect to the Plaintiff's migraine headaches was unsupported by her treatment note entries (AR 28).  The ALJ observed that

11

although Plaintiff alleged disability in part due to migraine headaches, the record revealed very little documentation regarding the nature and severity of any headache disorder (AR 28).

The ALJ further observed that Plaintiff had not been hospitalized or sought emergency room treatment for her impairments, and had not been seen by a specialist for her migraine headache complaints (AR 28). The ALJ also considered the Plaintiff's daily activities, noting that she was able to drive and perform household chores (AR 28). The ALJ found it significant that Plaintiff continued to work after her alleged onset date, which, in the ALJ's view, further undermined Dr. Bishop's opinions (AR 28). The ALJ further found it significant that Plaintiff continued to smoke cigarettes, despite being advised to quite by several physicians (AR 28).

We find that the ALJ provided sufficient grounds for discrediting Dr. Bishop's opinion that the Plaintiff was precluded from working and her conclusion in this regard is supported by substantial evidence. While Dr. Bishop reported that Plaintiff was disabled due to, *inter alia* "severe" COPD (AR 310), the diagnostic studies revealed that Plaintiff suffered from only moderate COPD (277). The ALJ also pointed to the lack of clinical findings supporting Dr. Bishop's opinion. The medical record reflects that while Dr. Bishop found Plaintiff had diminished breath sounds at her initial office visit on November 12, 2009 (AR 287), her remaining examinations revealed that Plaintiff's lungs were consistently reported as clear (AR 283; 285-286; 331; 338-339). In addition, while Dr. Wittmann found only mild expiratory wheezing and limited diaphragmatic excursion on physical examination, no signs of consolidation, effusion, pleural rub, or stridor were found (AR 316). Similarly, Dr. Bishop found Plaintiff was disabled due to peripheral vascular disease, but she consistently reported that Plaintiff's lower extremity examination revealed no cyanosis, clubbing or edema, and her pulses were normal (AR 283; 285-287; 331; 338-339). Likewise, Dr. Wittmann found no evidence of clubbing, cyanosis, ankle edema, or peripheral adenopathy (AR 316).

With respect to her complaints of migraine headaches, the Plaintiff argues that the medical evidence demonstrates that she suffers from severe headaches once a week. The treatment notes reveal, however, that during Plaintiff's first three office visits with Dr. Bishop, she only reported a past medical history of migraine headaches, and it was noted that her

medications were taken on an as-needed basis (AR 285-286). At her remaining office visits, it was again noted that Plaintiff had a past medical history of migraine headaches for which she was prescribed medication, and Dr. Bishop no longer diagnosed her with migraine headaches (AR 283; 331; 338). Thus, while the record reflects the Plaintiff was prescribed medication for migraine headaches on an as-needed basis, there is no documentation in Dr. Bishop's records supporting the frequency or severity of her headaches.

Plaintiff argues that once the ALJ rejected Dr. Bishop's opinion, the ALJ arbitrarily "play[ed] doctor" in concluding that she had the ability to perform light work since the ALJ failed to cite to an opinion from a "medical source" in formulating her RFC. *See* [ECF No. 9] pp. 8-9. As the Commissioner points out, the ALJ is responsible for assessing a claimant's RFC based upon a consideration of all the evidence in the record. 20 C.F.R. §§ 404.1546, 416.946; *see also Fargnoli*, 247 F.3d at 41. In *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 362 (3d Cir. 2012), the Third Circuit held that an ALJ is not precluded from reaching RFC determinations "without outside medical expert review of each fact incorporated into the decision." The court observed that although reliance on state agency physicians' and treating physicians' opinions is common, "the regulations do not require ALJs to seek outside expert assistance." *Id*; *see also Titterington v. Barnhart*, 174 Fed. Appx. 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties."); *Mays v. Barnhart*, 78 Fed. Appx. 808, 813 (3d Cir. 2003) (rejecting the claimant's argument that the ALJ's decision was not supported by substantial evidence because the record contained no expert opinion indicating the claimant could perform light work, noting that the ALJ was responsible for determining RFC and he was not required to seek a separate expert medical opinion); *Casillas v. Astrue*, 671 F. Supp. 2d 635, 655 (E.D.Pa. 2009) ("Plaintiff's argument, taken to its logical end, would effectively transfer the responsibility of making a final RFC determination from the ALJ to the medical expert—and, in turn, directly contravene that portion of the Social Security regulations expressly reserving RFC determinations to the ALJ rather than to any particular medical source."). We conclude,

therefore, that the ALJ did not err in her RFC assessment even in the absence of a medical opinion to that effect.

To the extent the Plaintiff claims the ALJ's RFC assessment is not supported by substantial evidence notwithstanding the absence of a medical source opinion with respect to her functional limitations, we disagree. The ALJ examined the Plaintiff's medical records relative to her impairments, discussed the various diagnostic studies, considered her course of treatment, considered her work history, and considered the Plaintiff's testimony in fashioning her RFC (AR 28-29). All of this evidence (as previously discussed) provided a sufficient basis for the ALJ's conclusion that the Plaintiff's impairments did not prevent her from performing light work with a sit/stand option at her discretion, without exposure to environmental irritants. Accordingly, we find no error in this regard.

Plaintiff's final argument is that the ALJ erred in assessing her credibility. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 29 C.F.R. §§ 404.1529(a), 416.929(a); *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999). In assessing subjective complaints, *SSR* 96-7p and the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. 20 C.F.R. §§ 404.1529(c), 416.929(c); *SSR* 96-7p, 1996 WL 374186 at *2. As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

The ALJ found that the Plaintiff's statements concerning her claimed limitations were not entirely credible (AR 27). In addition to her examination of the medical evidence as discussed above, the ALJ found it significant that the Plaintiff had not been hospitalized or sought

14

emergency room treatment for her symptoms, and despite her claims of severe symptoms caused by her COPD, she continued to smoke despite having been advised not to do so by several physicians (AR 28-29). While the Plaintiff faults the ALJ for these findings, the Commissioner's regulations provided that the treatment a claimant seeks is an "important indicator of the intensity and persistence" of claimed symptoms, *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), and an individual's statements may be deemed less credible if the level and frequency of treatment is inconsistent with the level of complaints. *Social Security Ruling* ("*SSR*") 96-7p, 1996 W 374186 at *7; *see also Klangwald v. Comm'r of Social Sec.*, 269 Fed. Appx. 202, 205 (3d Cir. 2008) ("the type of medical treatment received (or not received) is highly relevant in evaluating [the claimant's] credibility"). An ALJ may appropriately consider a claimant's failure to stop smoking in the credibility analysis. *See e.g. Hall v. Astrue*, 2012 WL 292473 at *16 (D.Del. 2012) (the claimant's failure to stop smoking may be considered by the ALJ in his credibility analysis); *Matta v. Astrue*, 2012 WL 3138010 at *7 (M.D.Pa. 2012) (ALJ appropriately considered the fact that the claimant continued to smoke where she was advised numerous times to quit).

      In sum, the ALJ's credibility determination with respect to the Plaintiff's subjective complaints is supported by substantial evidence.

## V. CONCLUSION

      For the reasons discussed above, Plaintiff's Motion will be denied and the Commissioner's Motion will be granted. An appropriate Order follows.

Case 1:12-cv-00135-SJM   Document 13   Filed 07/05/13   Page 16 of 16

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY ANN GREAVES, | ) |
| Plaintiff, | ) Civil Action No. 12-135 Erie |
| v. | ) |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER

AND NOW, this 5th day of July, 2013, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 10] is GRANTED. JUDGMENT is hereby entered in favor of Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Kimberly Ann Greaves.

The clerk is directed to mark the case closed.

                                s/ Sean J. McLaughlin
                                Chief United States District Judge

cm:   All parties of record